Albert S.N. Hee
04602-122
FPC Terre Haute
P.O. Box 33
Terre Haute, IN 47808
Pro Se Petitioner

United States District Court - Indiana

Albert S.N. Hee
Plaintiff

v.

Civil No. 2:18-cv-268-WTC-MJD

U.S. Federal Bureau of Prisons

Dr. Jeffery Allen, personally and in his official
capacity BOP Health Services Director

Dr. Revoue, personally and in her official
capacity as BOP Central Region Director
Wourth

Dr. James Pelton, personally and in his official
capacity as BOP West Regional Medical Director

Dr. Sheila Hadaway, personally and in her official
capacity as clinical director of FMC Rochester

Dr. Lon Krieg, personally and in his official capacity
as a treating physician, FMC Rochester

Dr. Assefa Ayalew, personally and in his capacity
as attending physician

Jane / John Does 1-12, personally and in their official
capacities

## Introduction

1. This lawsuit concerns the Federal Bureau of Prisons (BOP) and its employees' (Defendants) failure to provide Pro Se Plaintiff Albert S.N. Hee with adequate medical care. Defendants' continued and deliberate disregard of my serious medical conditions have and continue to damage my physical and mental health.

2. Defendants' actions violate the Eighth Amendment of the US Constitution.

3. Plaintiff seeks declaratory and injunctive relief as well as actual and punitive damages to be determined at trial.

1

4. This Court has jurisdiction pursuant to applicable statutes.

5. Plaintiff is currently in the Federal Prison Camp at Terre Haute, Indiana.

6. Defendants are all current, former or contract employees of BOP.

7. I have used the administrative remedies available to correct BOP indifference. I filed for a compassionate release in accordance with Title 18 USC 3582 on September 28, 2016 (Attached). It details the health problems I encountered and explained why BOP written policies are life-threatening and inapposite to the medical care regimen I require. The BOP has not responded. Since then my medical condition has been made worse by transferring me to a facility BOP DOCTORS have stated in writing is NOT SAFE for me and have requested I be transferred to a more suitable facility TWICE. BOP is not capable of handling my serious medical needs and does not care. On November 27, 2017, I requested administrative relief for denial of the first transfer request. My request encompassed the second transfer request by BOP Terre Haute doctors. It included a direct appeal on March 2, 2018, by letter to the Dr. Jeffery Allen, BOP Medical Health Services Director, at BOP's Central Office in Washington DC, by my attorney, Mr. Lex Smith. This was done after I was told the second transfer request was forwarded to Dr. Allen at the Central Office for final action. Dr. Allen never responded but on March 30, 2018, I received the final denial. I have now been incarcerated in an UNSAFE condition for over eight (8) months and the final decision not to transfer me was made by the doctor responsible for the health of all inmates in the BOP.

8. I am 63 years old and have a 40 year history of serious medical conditions. Between 1972 and 1976, while in the navy, I was given a course of monthly antibiotics to treat chronic bronchitis. The treatments severely compromised my immune system resulting in my developing severe allergies to: medications including antibiotics; environmental - molds, mildew, pollen; multiple foods; and a sensitivity to chemicals and odors.

9. The allergies caused severe asthma and anaphylaxis requiring numerous trips to an emergency room each year including one that required intubation, mechanical ventilation and an induced coma. That is the only time I have required hospitalization. There have been two incidents when I have lost consciousness. This is particularly distressing given the BOP's standard written treatment of epinephrine first and multiple times may cause my death. Additionally, if I were transported to an emergency room, I could not inform them about my serious medical conditions. My allergies have also contributed to other autoimmune problems.

10. In 2011, I had a heart attack requiring the placement of a stent. The heart attack changed the regimen of emergency medications to injectable Benadryl FIRST and the EpiPen SECOND. This is inapposite of BOP's medical treatment policies but widely recognized and supported because of the established danger of epinephrine possibly causing another heart attack. BOP's written medical policies acknowledge the danger of over stimulation but state epinephrine should be administered first and multiple times. see Attachment

11. All of my medical ailments and their treatments are recorded in detail and were the subject of extensive discovery including testimony by BOP's Dr. Pelton, during multiple sentencing hearings.

12. My medical conditions, while serious are well controlled by AVOIDANCE of allergens, DAILY medications and emergency use of injectible Benadryl. My medical regimen aggressively tries to STOP an allergic reaction from escalating into a life threatening condition. My multiple severe allergies have caused me to rapidly deteriorate to either status asthmaticus or anaphylaxis. Benadryl by injection must occur within minutes of the onset of an allergic reaction to stop any escalation. Administering epinephrine could cause another heart attack and should be a LAST resort.

13. I self-surrendered at FMC Rochester on June 15, 2016, at 10:30 am. I was designated to Rochester by a February 9, 2016, letter.

14. On June 15, 2016 at noon, Nurse Peggy Moore APRN-BC, conducted the initial medical interview. She copied the summary medical records I had brought but refused to accept a USB flash drive containing my complete medical records for the last 40 years. Nurse Moore then prescribed the medications I brought and have been taking. Dr. Hadaway immediately canceled all of my asthma and allergy medications while continuing my other medications without my knowledge. see Attachment

15. My medical records on the USB flash drive were sent to BOP previously in hard copy on January 15, 2016 by FedEx with confirmation to Dr. Pelton, Western Regional Medical Director and on Feb 25, 2016, the recommendations of my doctors were sent to BOP Medical Designations in Texas by FedEx with confirmation. BOP acknowledged receiving my medical records in a March 14, 2016, letter to my attorneys.

16. I surrendered the rest of my personal effects which BOP shipped to my home via UPS. I was to find out after my request for compassionate release, the my medications I brought were added to the UPS shipment. I was instructed to bring my medications and Omron nebulizer.

17. Six months later, UPS notified BOP my shipment had been lost. BOP had me fill out the UPS lost claim forms. However, when UPS reimbursed BOP for my lost personal goods, BOP kept the money. The UPS losses totaled over $1,000.

18. My Omron nebulizer which was retained by BOP for my use, was never found. BOP refused to replace it, reimburse me for it or allow me to replace it at my cost and caused its prescription to be withdrawn.

19. Although my condition is stable and does not require hospitalization, BOP initially designated me to the inpatient care unit which provides 24/7 care. Confining me as an inpatient is not ideal as my compromised immune system makes me susceptible to contagious diseases the other patients have. Inpatient care did not provide me with my required regimen.

20. On June 15, 2016 at about 3:00 pm, I met with Emily Twedt, RD, LD the dietitian to go over my food allergies. I informed Ms Twedt about my the use of injectible Benadryl and EpiPen for emergency allergic reactions.

21. On June 15, 2016, at about 8:20 pm, Dr. Assefa Ayalew, the doctor on duty conducted an initial physical examination. During the examination I told Dr. Ayalew that I had not rec'd my asthma and allergy medications since being admitted earlier that day.

23. On June 15, 2016 at about 2:00 pm Physicians Assistant Lee Witter PA-C discussed with Nurse Moore and Dr. Hadaway my current asthma and allergy medication regimen. They apparently agreed or did not disagree with Dr. Hadaway's decision to withhold my daily medications for my chronic asthma and allergies. To this day, Dr. Hadaway has never examined or consulted with me.

24. On June 15, 2016, I met with Krystl Taylor, RN and explained my need for injectible Benadryl.

25. On June 17, 2016, I met with Jason Stone, NP and complained about tightness in my chest due to not being given my asthma and allergy medications.

26. At each opportunity, I explained my need for daily (asthma and allergy) and emergency medications (injectible Benadryl and an EpiPen) to all medical staff.

27. On June 21, 2016, I met with Physicians Assistant Lee Witter PA-C and complained about not receiving my asthma and allergy medications.

28. On June 22, 2016, after seven days without my medications, I met and was examined by Dr Lon Kreig for the first time. Dr. Kreig noted my peak expiratory flow (Wright test) had become, "drastically worse without any objective change in my appearance." He subjectively attributed my dangerously reduced respiration to my lack of effort. The Wright test was administered by BOP medical personnel and is a standard medical test used to provide an objective measurement of respiratory health and is specified in BOP's Management of Asthma publication.

29. I was given my asthma and allergy medications after my attorneys and my wife wrote letters to the warden and court.

30. The importance of not stopping daily medications for chronic conditions is well established and is prominently displayed on a sign at Rochester which states:

"CHRONIC MEDICATIONS CAN BE PRESCRIBED FOR A MAXIMUM OF 180 DAYS. EXPIRED (OR SOON TO BE EXPIRED) PRESCRIPTIONS CAN BE EASILY RENEWED THROUGH SICK CALL AT NO CHARGE. NEVER STOP TAKING CHRONIC MEDICATIONS WITHOUT MEDICAL ADVICE TO DO SO!"

31. During my sentencing, Dr Pelton submitted two written statements and orally testified. He stated that BOP would have my medications when I reported as long as they had advance notice. The prosecutor testified two days before I reported that Rochester was ready to receive me. Dr Pelton also stated he had received and reviewed my doctors' recommendations. They included:

32. Dr. Phillip Foti, the emergency room physician that saved my life stating: "he [Mr. Hee] should be considered at high risk for sudden death due to status asthmaticus in an attempt to guide future management of his airway disease... Immediate medical intervention in the form of airway intubation and mechanical ventilation may be required...death will result from the failure to properly and promptly apply these measures...High risk individuals like Mr. Hee...are required to adhere to an assiduous regimen of medical care, to manage and adjust medications and to maintain heightened surveillance both to guard against exposure to allergens as well as to ensure quick transport to proper medical facilities... because treatment requires the immediate creation of an airway and artificial maintenance of ventilation."

33. Dr. Stephen Berman, my physician for over 30 years, stated: "I am very troubled by any suggestion that Mr. Hee's medical condition and disruption of his treatment regimen is not life-threatening...the most important component of his treatment regimen was [is] to avoid exposure to all known allergens. Avoidance continues to become increasingly important because each successive anaphylaxis event increases his risk of death...The second important aspect of his treatment regimen deals with countering the effect of exposure to allergens through daily medications of Benadryl and bronchodilators and the ability to immediately self-medicate with high potency oral and injectable Benadryl...The immediate use of Benadryl is to stop the allergic reaction...and prevent the unnecessary use of epinephrine [EpiPen]...After Mr. Hee suffered a heart attack in 2011, I specifically cautioned him on the dangers of using epinephrine, as it may cause arrhythmia, which may...cause blood clots...Epinephrine is not the preferred response to an allergic attack...Epinephrine is the standard drug prescribed for anaphylaxis; however, in Mr. Hee's case, it should only be administered if the immediate use of oral and injectable Benadryl cannot prevent the onset of anaphylaxis...[In 1996] Mr. Hee's allergy treatment regimen was modified to i) avoidance of allergens; ii) daily use of oral Benadryl; iii) emergency use of oral and injectable Benadryl immediately upon the onset of an allergic response; and iv) emergency use of epinephrine if Benadryl failed...The time to administer injectable Benadryl to Mr. Hee in appropriate quantities, and the time in which to transfer Mr. Hee to an emergency room is critical for Mr. Hee."

34. In response Dr. Pelton, BOP Western Regional Medical Director, ignored my medical regimen to prevent an allergic exposure to escalate stating: "...it is unlikely that Benadryl would ever be a life-saving drug." He reiterated BOP policy is epinephrine immediately and often.

35. On April 12, 2018, I was examined by Dr. Mercho, a BOP cardiologist. He stated: "I do agree that using epinephrine at times for anaphylaxis could potentially induce vasospasm at the site of his coronary stenosis, hence this may induce myocardial infraction in rare occasions." He also noted the stress this issue was causing me.

36. Dr. Pelton also testified; "For emergency situations, defined as those presenting danger to life or limb, BOP policy provides that medical care be available within FOUR minutes. Patient Care, Program Statement 6031.04...the BOP consistently meets this standard...In the event of an allergic onset, the defendant would be seen by medical staff within FOUR minutes in an emergency situation, who could provide care on par with that available in the community, including the administration of Epinephrine or the use of a medical device to create and support an airway in the trachea."

37. The reasons for the Doctors here requesting I be transferred are: "We Request...[transfer] to a different facility for multiple environmental allergies as well as food allergies resulting in anaphylaxis in the past as well as severe asthma attacks. Currently he is suffering from hives despite therapy with Zyrtec, Benadryl and fluticansone...We do not feel he is SAFE to stay at our facility. It can take up to [TWENTY] 20 minutes for a nurse to respond to the camp at night as we do not have an evening camp nurse...we are very short on providers and only have a single MLP for the entire complex [three separate facilities]...he needs to be placed at an institution with evening medical staff coverage...as well as somewhere with air conditioning available to decrease his allergy exposure."

38. The transfer was requested after my initial examination by Dr. Trueblood over eight (8) months ago. It was approved by Warden Bell. I have also been told by the medical staff here they are not authorized to create and support an airway in my trachea should it become necessary.

39. The reason given for not transferring me is I have "not had any significant allergies, anaphylaxis or asthma." My records document I have required injectible Benadryl on numerous occasions for my allergies and the medical staff have prescribed an additional daily asthma medication after an examination. They also document that my aortic root has increased to where I am now at the upper limit. Any further increase will necessitate open heart surgery. Additionally, I now suffer from vertigo. I have had two bad falls however, I have been lucky in that I have not hit my head. Although the medical staff does not know the cause of the vertigo, they told me it can be a result of high doses of Benadryl.

40. The transfer denial does not address minimizing my exposure to allergens by way of air conditioning. Terra Haute is one of the oldest facilities in BOP. Besides no air conditioning, the roof leaks in multiple areas and the bathrooms on the second floor leak onto the first floor.

41. The transfer denial does demonstrate the medical staff's misunderstanding that epinephrine is the ONLY emergency medication used for my medical condition. This misunderstanding is per BOP policy. Supervisory Clinical Nurse Sara Booth RN stated: "Inmate Hee has had no significant reactions." When she made her written statement, nurse Booth had never examined or spoken with me. She relied on another nurse asking me if I have used my Epipen while here. I did not know why the nurse asked me about my EpiPen use. The nurse later told me: "I just wanted to know because my boss [Booth] asked." My records show I have doubled my daily intake of oral Benadryl (100 mg/day) have needed injections of Benadryl several times during the summer months and have taken 200 mg daily several times since coming here.

42. The transfer denial addresses medical staff shortages at Terra Haute and Butner, the camp BOP was going to transfer me too before deciding to leave me here: "Butner Camp staffing is similar to THX (Terra Haute) so there is no benefit achieved in that transfer." I should not be placed at risk because of BOP medical staff shortages.

43. Before being incarcerated, I have lost consciousness during a medical emergency twice. Should that occur while in custody, BOP medical staff is trained to follow written protocol. Indeed the BOP National Formulary signed by Dr. Allen, states medical care should adhere to the Formulary and the warden is responsible for insuring this. see Attachment. The medical staff will administer epinephrine multiple times and will not administer benadryl as per policy. Additionally, should I be transported to a hospital unconscious, the hospital will not have any record of my allergies, including medications which they may use, nor my heart condition. Knowing this is extremely stressful.

44. I had requested to be transferred to the Federal Prison Camp at Devens believing I could be transported to an emergency room faster and less likely to be confined to an area that has allergens due to the lower security specified for my crime. The higher security because I was "behind the fence" at FMC Rochester had a measureable increase in the time it took to be taken to an emergency room. The 24/7 care did not change the policy of epinephrine FIRST nor decrease the time it takes to get benadryl. see Attachment. Devens is also located in the Northeast, the only area of the continental US where I lived for eight years experiencing its allergens. Devens also has a smaller camp population reducing the chance of coming in contact with personal hygiene products other inmates use that cause an allergic reaction. The camp at Devens is also air conditioned which will lower my exposure to environmental allergens.

45. The dangers food allergen exposure due to BOP's reliance on inmates to fix my meals is too long to describe. Dr. Pelton testified "it would be challenging." However, he assured the court of BOP's ability to "handle it." It has not.

46. The facts meet the objective and subjective standards required in Estelle v Gamble, 429 US 97 (1976), Helling v McKinney, 509 US 25 (1993) and need for intervention of equity in Farmer v Brennan, 511 US 825 (1994).

47. The damage to my health that has already occurred constitutes battery. Levin v US, 568 US 503 (2013).

48. BOP's actions are arrogant. They: i) kept the money UPS paid for losing my personal property; ii) refused to allow me to buy another Omron portable nebulizer that I can carry with me; iii) stopped my medications for my chronic medical conditions; iv) has not processed my medical request for compassionate release; v) has not changed their policy detailed in the compassionate release to provide the proper medical treatment for me; vi) did not address all of the reasons I am not SAFE here; and vi) instead of transferring me to a SAFER camp, sent and intends to keep me in an UNSAFE camp exposing me to known allergens damaging my health and a higher risk of death.

BOP has shown it is not capable of treating my serious medical conditions. Their written policies of epinephrine first and multiple times puts me at risk for another heart attack. In a emergency situation, I should not be having to trade one life-threatening emergency (allergies or asthma) with another (heart attack). My reluctance to use my EpiPen to avoid putting myself at risk of another heart attack, is the reason for the "he hasn't used his EpiPen so he must be doing ok" denial to transfer me to a SAFE facility. In Rhodes v. Chapman, 452 US 337, 352 (1981), the Court stated: "A remedy for unsafe conditions need not await a tragic event." BOP made their decisions to stop my medications and put me in an UNSAFE facility with the documented knowledge of my serious medical needs and the harm that may result from their actions. Their actions are not discretionary or a mere difference of opinion. BOP's decisions show a conscious disregard of a substantial risk of serious harm. Exposure to known allergens and unavailability of immediate injectable benadryl may force me to use my Epipen. This poses an unreasonable risk of serious damage to my present and future health. My doctors laid out very clearly the seriousness of my medical issues.

## RELIEF REQUESTED

I request immediate declaratory and injunctive relief in the form of an order to transfer me directly to the Federal Prison Camp at Devens and allow me to carry injectible benadryl or immediately petition for a compassionate release. Dr. Pelton mislead the sentencing judge who was considering home confinement until Dr. Pelton convinced her I would receive the same level of medical treatment and exposure to allergens as I experience outside of prison. BOP has shown this is untrue. BOP Program Statement 5050.49 states: "A motion for a modification of a sentence will be made to the sentencing court only in particularly extraordinary or compelling circumstances that could not reasonably have been foreseen by the court at the time of sentencing." 18 USC 3582(c)(1)(A); 28 CFR Section 572.40. In U.S. v Willis, 322 FSupp 2d 76 (Mass 2004), the Court ordered home confinement in a case with the same offense and a challenging medical condition in spite of BOP's representations.

I further request a trial for violation off my Eighth Amendment rights under Bivens vs Six Unknown Agents, 403 US 338 (1971) and 42 USCS 1983. BOP and the individual Doctors' actions constitute unnecessary and wanton infliction of physical and mental pain. Estelle v. Gable, 429 US 974 (1976) I do not wish for my family to be put in the same situation as occurred in Carlson v Green, 446 US 14 (1980) where the inmate died from the treatment he received for asthma. In Ricketts v Ciccone, 371 FSupp. 1249 (W.D. Mo. 1974), the District Court ordered the transfer of a federal prisoner to another facility because of his allergy to mold.

Signed this 12 day of June, 2018 at Terre Haute

Albert S.N. Hee, Pro Se